MORRISON (NETTLETON v.). See Case No. 10,127.

MORRISON (PATAPSCO GUANO CO. v.). See Case No. 10,792.

## Case No. 9,848.

### MORRISON v. The PETALUMA.

[1 Sawy. 126.] [1]

District Court, D. California. April 13, 1870.

COLLISION — FOG — VESSEL AT ANCHOR — APPORTIONMENT.

Collision between a steamboat and vessel at anchor, in a fog. Damages apportioned, it appearing that the vessel had neither a bell nor a fog-horn. and that the steamer failed to moderate her speed.

[This was a libel by Daniel Morrison against the steamboat Petaluma, to recover damages sustained in a collision.]

McAllisters & Bergin, for libellant.

Sol. A. Sharp and Milton Andros, for claimant.

HOFFMAN, District Judge. The schooner William Hamilton, while on a voyage from Antioch to Oakland, on the third day of February, came to an anchor abreast the stone quarry near the southerly end of Angel Island. The tide was ebb, the weather very foggy, and there was no wind. She was obliged to anchor, as she had reached a point where she was liable to drift with the ebb tide towards the Heads.

She had on board a master and one man. They both admit that there was neither a bell or a fog-horn on board, but they state that at short intervals they endeavored to warn approaching vessels of their presence by shouting and by striking the brakes of the windlass with an iron bar.

About 5½ o'clock the steamboat Petaluma, bound from Petaluma to this city, collided with the schooner, inflicting such injury as to lead the men on board the latter to jump instantly upon the steamer to save their lives. The schooner was thereupon abandoned. She has since been recovered and is now on the beach at Sausalito.

It is not disputed that a dense fog prevailed at the moment of the collision. The schooner was first seen by the master, the pilot, the lookout of the steamer, and by several of the passengers, at a distance of from two hundred to three hundred feet; and as soon as under the circumstances she could possibly have been discovered, everything appears to have been done by the steamer which skill and diligence could suggest to avoid the collision.

On the part of the steamer it is urged that the schooner was in fault in not having and using a bell, or at least a fog-horn. Art. 10 of the "regulations for preventing collisions on the water," provides (Act April 29, 1864, 13 Stat. 60) as one of "rules governing fog signals," that "whenever there is a fog, whether by night or by day, the fog signals described below shall be carried and used, and shall be sounded at least every five minutes. Sailing ships under way shall use a fog-horn.

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

Steamships and sailing ships, when not under way, shall use a bell."

These provisions are positive and peremptory. There would seem to be more necessity for their observance by coasters and small craft navigating internal waters, frequented by steamers and other vessels, than by ships navigating the high seas. The schooner Hamilton was an enrolled vessel, and subject to the laws regulating the commercial marine of the United States.

She was, therefore, clearly in fault in not sounding a bell as required by law. It is not disputed that at the moment the schooner was discovered, the steamer was going at her usual rate of speed—probably with the ebb tide—from twelve to fifteen miles an hour.' The 16th article of the regulations provides that "every steamship shall, when in a fog, go at a moderate rate of speed."

In excuse for non-compliance with this regulation, it is urged on the part of the steamer, that it is necessary in foggy weather to run by compass, and that the position of a steamboat can be known only by timing her, and thus estimating the distance, and that to do this it is necessary for her to run at her usual rate of speed. This excuse is but an attempt to justify a deliberate violation of the act of congress. A similar excuse was rejected, even before the passage of the act of 1864, by the supreme court, in the case of McCready v. Goldsmith, 18 How. [59 U. S.] 91. In that case the court observes: "A passenger on board who witnessed the collision, was struck with the impropriety of the rate of speed, and asked why they ran so fast in a fog, and was answered that it was necessary in order to enable them to keep their reckoning in going from place to place. And we learn also from the testimony of the pilot and some others, that they make no difference in the rate of speed in consequence of a fog; that they go slow when making land or a light, or in narrow passages, and when sounding the lead—as if the only precautions they were bound to observe, in the navigation, was as it respected the safety of their own vessel. We will only repeat what we said in the case of Newton v. Stebbins, 10 How. [51 U. S.] 606, 'that it may be matter of convenience that steam vessels should proceed with great rapidity—but the law will not justify them in proceeding with such rapidity, if the property and lives of other persons are thereby endangered.' "

A similar opinion to that referred to by the supreme court seems to be entertained by some of the steamboat captains in these waters. Captain Bromley, of the "Julia," in reply to a question of the court, says: "When I say it is safest to keep up the usual rate of speed—I mean for the steamboat. If we are going along looking out for vessels, of course we go slow; most of them have horns, and we have our steam whistles."

The latter course is precisely the one which the act of congress requires steamers to adopt. It is also urged that it is safer to go at a high rate of speed, because the course of a vessel can in that case be more suddenly deflected than if her rate of speed be low.

This, again, is an attempt to justify a deliberate violation of law; nor, though several witnesses have so sworn, does the reason assigned for maintaining a high rate of speed, appear to be well founded. Captain Bromley's testimony alone furnishes a sufficient answer to it, and the conduct of the Petaluma, as disclosed by the testimony in this case, shows that her officers did not act upon the theory that in a fog vessels can be avoided by a steamer more easily at a high than at a low rate of speed. The officers of the Petaluma testify that, when warned of the approach of the up-boats by their steam-whistles, they slowed down, and continued at a low rate of speed, until the boats were seen and passed; when their usual rate of speed was resumed.

I am satisfied that not only the law, but sound policy requires that all vessels should be held to an exact compliance with the regulations established for their governance by act of congress, and that their officers should be advised that for any violations of those regulations they will be held responsible, except in the cases contemplated by the 20th article of the regulations, and except that it appear by unquestionable proofs that the violation of the law in no degree contributed to the disaster.

Both vessels being thus found to be in fault, the damages must be apportioned. They will be ascertained by reference to the commissioner.